## EXHIBIT A

## AFFIDAVIT OF STEPHEN J. KELLEHER

I, Stephen J. Kelleher, being duly sworn, depose and state as follows:

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI"), Department of Justice, since approximately July 2004. I am currently assigned to the Boston Division of the FBI, Squad CE-1, and am a member of the Organized Crime Drug Enforcement ("OCDETF") Task Force in Boston and the Greater Boston High Intensity Drug Trafficking Area ("HIDTA") Task Force. Prior to my current position, I was employed as a police officer in Seekonk, Massachusetts, and East Providence, Rhode Island.

2. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of the proceeds of narcotics trafficking activities. Among other things, I am familiar with the manner in which narcotics traffickers use hidden compartments in vehicles to transport and distribute narcotics and the proceeds of narcotics trafficking; the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities; the vernacular, jargon, and coded messages that users and distributors of controlled substances use in an attempt to disguise the subjects of their conversations and operations; and the typical price, packaging, and method of sale of narcotics in Massachusetts and elsewhere.

3. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following assets:

   a. $32,000 in United States currency seized from Francis Guerrero on May 8, 2010 in Mattapan, Massachusetts;

b. $28,000 in United States currency seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

c. $6,080 in United States currency seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

d. $6,010 in United States currency seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

e. $1,014.40 in United States currency seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

f. $182 in United States currency seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

g. one money order in the amount of $1,000 seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

h. one money order in the amount of $200 seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

i. one money order in the amount of $30 seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts, on June 2, 2010;

j. $3,315 in United States currency seized from 6 Priesing Street, Apartment 3, Jamaica Plain, Massachusetts, on June 2, 2010;

k. $1,856 in United States currency seized from 35 Wales Street, Apartment 4, Boston, Massachusetts, on June 2, 2010;

l. $601 in United States currency seized from 35 Wales Street, Apartment 4, Boston, Massachusetts, on June 2, 2010;

m. $543 in United States currency seized from Santo Lara Pena, *a.k.a.* Juan Hernandez, on June 2, 2010, in Dorchester, Massachusetts; and

n. $20 in United States currency seized from Raul Pena on June 2, 2010, in Hazelton, Pennsylvania.

(collectively, the "Currency").

4. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C.

§§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

5. This affidavit is based upon my personal knowledge, as well as information provided to me by other law enforcement personnel involved in the investigation, and my review of records and reports relating to the investigation.

6. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

## I. Introduction: Narcotics Trafficking

7. Based on my experience and training, I know that in a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered:
(a) controlled substances, such as marijuana, cocaine, heroin, and other illegal drugs;
(b) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances; (c) books, records, receipts, notes, ledgers, prescriptions, and other papers relating to the distribution of controlled substances; (d) personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to individuals involved in the distribution of controlled substances; (e) cash, currency, and records relating to controlled substances income, and expenditures of money and wealth; (f) specially manufactured hidden compartments known as "hides" that are used to store drugs and drug proceeds;
(g) cellular phones, pagers, and other communications devices; and (h) firearms and other dangerous weapons.

8.  Based on my experience and training, I also know that it is generally common practice for drug traffickers to conceal, at their residences, large sums of money. This money either represents proceeds from drug sales or money to be used to purchase controlled substances, and that the sale of narcotics is primarily a cash-based system.

9.  Based on my experience and training, I know that drug traffickers use cellular or mobile telephones to communicate and to facilitate the purchase and sale of narcotics. These mobile telephones are often listed under different names and others are pre-paid cellular telephones, which are used with the intent to frustrate the efforts of law enforcement to identify the user of the telephone. Pre-paid telephones allow members of a drug trafficking organization to purchase the telephones without providing personal identifying information. Drug trafficking organizations often purchase pre-paid cellular telephones in bulk and distribute them throughout the organization and rotate them among members to further conceal the identity of the users.

## II. Overview of the Investigation

10.  Beginning in November 2008, I personally participated in the investigation of a Boston-based drug trafficking organization involving Raul Pena, *a.k.a.* Wilfredo Alvarez Ayala ("Pena"); Bienvenido Rodriguez, *a.k.a.* Stanley ("Rodriguez"); Sally Encarnación ("Encarnación"); Pablo Luis Santiago, *a.k.a.* Pablo Molina-Santiago or Raulín ("Raulín"); Pedro Calderon ("Calderon"); Santo Lara Pena, *a.k.a.* Juan Hernandez or Prieto ("Hernandez"); and others.[1] I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other agents of the FBI, the Drug Enforcement Administration ("DEA"), and other federal, state, and local law enforcement agencies (collectively, "the investigators");

---

[1] Several of the individuals involved in this drug trafficking organization, including Santo Lara Pena, who was known as Juan Hernandez, are citizens of the Dominican Republic and were living in the United States under false names and identities.

oral and written reports from the above-referenced agencies of conversations and meetings with confidential sources; a review of preliminary transcripts of intercepted telephone calls and consensually recorded conversations; and my own personal participation in the investigation, including conducting physical surveillance.

11.   The investigation revealed that this drug trafficking organization was led by Pena, which distributed approximately 50 to 100 kilograms of heroin in the Boston area between November 2008 and May 2010. In approximately January 2010, after one of his stash houses was burglarized and more than two kilograms of heroin was stolen, Pena moved to Pennsylvania. Pena continued to run his Massachusetts-based heroin trafficking organization remotely from Pennsylvania, primarily conducting his business through cellular telephone communications.

12.   As a result of the wiretaps, investigators intercepted hundreds of calls between Pena and his drug suppliers, drug purchasers, and associates. During these calls, Pena placed orders for heroin with suppliers and took heroin orders from customers. He also directed his associates to dilute and mix heroin, to deliver heroin orders, and to collect drug debts from customers. Pena and his associates often used various code words to conceal their discussion regarding the purchase, sale, and preparation of the narcotics. For instance, the word "food" was used frequently in these conversations, which was a code word they used to mean heroin. Pena and his associates also used the terms "transmissions" or "cars," which referred to kilograms, and "tickets," which referred to money. The wiretaps also provided additional information regarding who Pena's associates were and what role they played in the organization.

13.   The investigation into the heroin trafficking organization led by Pena began in November 2008 and ended with the arrest of Pena, Raulín, Encarnación, Hernandez, Calderon and several of his associates in June 2010. Beginning in December 2009, the investigators obtained

wiretaps on ten telephones, including six telephones used by Pena, one telephone used by Calderon, and two telephones used by two additional associates.

14. Information received from the wiretaps revealed that Raulín, Pena's son, and Hernandez, Pena's nephew, worked for Pena in the heroin trafficking business. Raulín and Hernandez accepted deliveries of heroin from suppliers, mixed and repackaged the heroin for sale, took orders from heroin purchasers, delivered heroin orders, collected drug proceeds, delivered heroin samples to Pena's heroin tester, and paid heroin suppliers for heroin purchased on consignment. Both Raulín and Hernandez received a weekly salary from Pena for their contributions to the heroin trafficking organization.

15. Hernandez worked for Pena for approximately nine months until approximately March 2010. Herndandez was subsequently arrested on June 2, 2010. Based on the paraphernalia that was found in his apartment, as discussed in paragraphs 64 and 65, I have probable cause to believe that Hernandez was still involved in drug trafficking from March 2010 until his arrest on June 2, 2010.

16. The information received from a 30-day wiretap on a telephone used by Calderon revealed that, on behalf of Pena, Calderon delivered heroin to purchasers and collected drug proceeds from these purchasers. The wiretaps also revealed that Calderon delivered heroin and collected drug proceeds almost daily. Calderon also kept track of Pena's customer heroin debts and held money, on behalf of Pena, collected in repayment of those debts. Following his arrest, Calderon admitted to delivering approximately 200 to 300 grams of heroin weekly to one customer and to delivering regularly to two or three additional customers. Calderon was compensated for his services; he received a weekly salary of $1,000 from Pena.

17.     The investigators also discovered through the wiretaps that Encarnación was a key advisor to Pena and was heavily involved in the monetary side of Pena's heroin organization. On numerous occasions, investigators intercepted telephone calls between Encarnación and Pena, whereby Encarnación reported to Pena the amounts of money owed by various customers and how much money had been collected.

18.     The investigation further revealed that Rodriguez was connected to the Pena drug trafficking organization. Rodriguez, an individual who has previously pleaded guilty for attempted sale of a controlled substance, supplied Pena with kilogram quantities of heroin.[2] Rodriguez also used couriers, including Frances Yvanoba Guerrero, to deliver the heroin and to collect drug proceeds.[3]

19.     On May 27, 2010, a federal grand jury in the District of Massachusetts returned an Indictment charging Pena, Encarnación, Rodriguez, Calderon, Raulín, Hernandez, and five others with conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) (Count 1) (the "Indictment"). *See United States v. Pena*, Case No. 10-cr-10183, U.S. District Court for the District of Massachusetts. In the Indictment, Raulín (Count 2), Hernandez (Count 3), and Calderon (Count 4) were indicted on one count each of distributing heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. *See id.* Pena also was indicted on Counts 2, 3, and 4. *See id.*

20.     On June 1, 2010, I presented a sworn affidavit to Magistrate Judge Judith G. Dein seeking warrants to search six residences, including the residences of Encarnación; Ana

---

[2] In 2007, Rodriguez pleaded guilty to four counts of attempted sale of a controlled substance, one count of criminal possession of a loaded firearm, and one count of conspiracy in New York County Supreme Court.
[3] On December 20, 2009, Rodriguez pleaded guilty to one count of attempted misdemeanor possession of a controlled substance in Elmira City Court in New York.

7

Encarnación and Raulín; Angelica Encarnación; and Calderon. Through the intercepted telephone calls, physical surveillance of Pena and his associates, and from other sources, the FBI discovered that Pena and his associates used these locations to coordinate the receipt of heroin and to distribute it. They also used these locations to store, package, and prepare heroin for delivery to customers and to store drug proceeds. On June 1, 2010, Magistrate Judge Judith G. Dein issued search warrants, which were executed on June 2, 2010.

21. On April 26, 2011, Pena pleaded guilty to all four counts listed in the Indictment. On August 2, 2011, he was sentenced to 14 years' imprisonment and five years of supervised release. On May 14, 2013, the United States Court of Appeals for the First Circuit dismissed Pena's appeal of his conviction.

22. On April 7, 2011, Calderon pleaded guilty to Counts 1 and 4 of the indictment. On July 14, 2011, he was sentenced to two years' imprisonment and three years of supervised release. He did not appeal his conviction or sentence.

23. On April 20, 2011, Encarnación pleaded guilty to Count 1 of the Indictment. On July 19, 2011, she was sentenced to 42 months' imprisonment and three years of supervised release. She did not appeal her conviction or sentence.

24. On April 20, 2011, Raulín pleaded guilty to Counts 1 and 2 of the Indictment. On July 13, 2011, he was sentenced to three years' imprisonment and three years of supervised release. He did not appeal his conviction or sentence.

25. On April 20, 2011, Hernandez pleaded guilty to Counts 1 and 3 of the Indictment. On July 13, 2011, he was sentenced to four years' imprisonment and three years of supervised release. He did not appeal his conviction or sentence.

26. Rodriguez remains a fugitive.

### III.     The Currency

27.     The Currency seized by law enforcement in connection with the investigation of the Pena drug trafficking organization came from various sources: (1) a search incident to a traffic stop on May 7, 2010; (2) searches of residences pursuant to federal search warrants executed on June 2, 2010; and (3) searches of Hernandez and Pena incident to their arrest on June 2, 2010.  Each of the seizures are described below.

#### A.     The Seizure of $32,000 from Francis Yvanoba Guerrero on May 8, 2010

28.     On May 7 and 8, 2010, Pena and Calderon arranged to collect money owed to Rodriguez for heroin previously delivered to Pena's organization.

29.     At approximately 6:43 p.m. on May 7, 2010, Pena called Calderon and told Calderon to meet Rodriguez, who he further described as the "guy from the store, on Centre." Calderon recognized "the store" as the one next to "Frank's" or "Frankie's CDs." Research from the investigators revealed that "Frank's" is Franklin CD & Envios, which is located on 314 Centre Street next to D'Paola's Jewelry and Accessories in Boston, Massachusetts. Rodriguez is listed as a business contact for D'Paola's Jewelry and Accessories in a public database.

30.     At approximately 7:20 p.m. on the same day, Pena called Calderon and asked him to gather money together to call Rodriguez. At approximately 7:43 p.m., Rodriguez called Pena. Pena stated that he would have the money together later and would call Rodriguez back. At approximately 9:38 p.m., Pena called Raulín and discussed how much money they would give Rodriguez (at that time $21,000). At approximately 10:23 p.m., Raulín called Pena, and Pena told Raulín to give Rodriguez $23,000. Raulín complained that he had been waiting for Rodriguez since 8:00 p.m.

31. On May 8, 2010, Sargent Detective Timothy Duggan ("Detective Duggan") and Detective Adolfo Brito ("Detective Brito") of the Boston Police Department ("BPD") were conducting surveillance in the area of 35 Wales Street. At approximately 4:20 p.m., they saw Raulín and another indicted co-conspirator, Edgardo Pedraza ("Pedraza"), get out of a vehicle driven by Calderon and enter 35 Wales Street. At approximately 8:20 p.m., Raulín returned from doing laundry, and Pedraza let him into 35 Wales Street. Between approximately 9:00 p.m. and 9:10 p.m., Pedraza took a cab to pick up dry cleaning and returned to 35 Wales Street.

32. Pena and Rodriguez spoke again by telephone at approximately 8:31 p.m. on May 8, 2010. Pena said, "They want to leave, old man." Rodriguez told Pena that he would call "Morena" and tell her to "go there to pick it up" because she was "nearby." At approximately 9:25 p.m., Rodriguez called Pena and told him to "tell Raulín to open the door for Morena in two minutes." Pena replied, "Tell her to knock on the number four." Based on my participation in this investigation, I know "the number four" to refer to 35 Wales Street, Apartment 1.

33. Pena then called Raulín and told him that someone was going to "knock at your door in two minutes." Raulín asked, "Is it Stanley?" Pena replied, "His wife, his girlfriend."

34. At the same time, surveillance in the area of 35 Wales Street observed a female later identified as Francis Yvanoba Guerrero ("Guerrero") arrive in a brown Porsche Cayenne, bearing Massachusetts license plate 884DG2, registered to Guerrero, park outside of 35 Wales Street, and enter 35 Wales Street carrying a bag. Several minutes later, Guerrero left 35 Wales Street carrying the same bag, which appeared to contain something heavy.

35. At approximately 9:30 p.m. on May 8, 2010, BPD Officers Jeffrey McLean ("Officer McLean") and Henry Doherty ("Officer Doherty") stopped Guerrero's car on the corner of Blue Hill Avenue and Goodale Road in Mattapan, Massachusetts. At the time of the traffic

stop, Guerrero was driving, and a female passenger, later identified as Nidia Altgracia ("Altgracia"), was also in the car.

36. Detective Duggan was also at the scene of the traffic stop. He asked Guerrero whether there was any contraband inside the car. Guerrero responded no and consented to a search of the car. Detective Duggan checked Altgracia's purse and found no contraband. When Detective Duggan examined the purse, he noticed several brick-like objects in a zipped inside pocket of the purse. Detective Duggan asked Guerrero what the brick-like objects were, and she responded that it was $20,000 that she received from her sister, who lived on Harvard Street. Guerrero also stated that she worked at a bank on Hyde Park Avenue, located in Hyde Park and that the money was to pay for her car, the Porsche Cayenne. When Detective Duggan asked her why she did not keep the money in a bank, Guerrero stated that she did not want to lose her Section 8 housing.

37. Detective Duggan then pulled a dark green plastic bag out of the zipped inside pocket of Guerrero's purse and discovered that the brick-like objects comprised three large bundles of United States currency and two smaller bundles. Investigators later counted the money and determined that the total amount was $32,000 in United States currency (*i.e.*, one of the properties comprising the Currency).

38. Detective Duggan explained to Guerrero that the money would be seized and taken to District 3 of the BPD. He provided her with his business card and stated that she could pick up a receipt for the seized money at District 3 after it had been accurately counted.

39. At approximately 10:29 p.m. on May 8, 2010, Rodriguez called Pena and told him that "the woman was stopped by those people . . . and they took it." Rodriguez explained to Pena

11

that Altgracia had been stopped by the police "when she left your house," and the officers had taken the money. Pena stated that he would call the "ones who have that house hot."

40. Pena immediately called his son, Raulín, and informed him that "Stanley called saying that when the woman was leaving the apartments they stopped her and took all the money…those thirty thousand that you paid her." Pena then scolded Raulín and instructed him on how to avoid being targeted and arrested by the police. Raulín responded that he always looks around and that he did not "see any suspicious car."

**B. Currency Seized from 35 Wales Street, Apartment 4, Boston, Massachusetts on June 2, 2010.**

41. During the course of the investigation, investigators had probable cause to believe that Encarnación's residence was 35 Wales Street, Apartment 4, Boston, Massachusetts ("35 Wales Street") because it was listed on her Massachusetts driver's license as her residence. Encarnación received public assistance and section 8 housing, pursuant to the Housing Act of 1937, 42 U.S.C. § 1437f, for the rent associated with this apartment. The apartment was within a brick, multi-unit building, and the entrance door to the building was marked with the number "4."

42. Investigators also had probable cause to believe that the apartment was being used to conduct drug trafficking. Other investigators and I observed Pena, Raulín, Calderon, and other associates entering and exiting 35 Wales Street in a pattern that indicated that the heroin trafficking organization was using the apartment to conduct some aspect of drug trafficking.

43. Telephone intercepts also captured Pena directing suppliers and their couriers to 35 Wales Street to collect drug debts from customers. In directing such individuals to 35 Wales Street, Pena repeatedly used the terms "brick building," "35," and "number 4" to describe the location. Based on my experience and training, all of these terms were used to refer to 35 Wales Street, Apartment 4. Surveillance also observed people entering and leaving 35 Wales Street

subsequent to intercepted calls and at times during the day that correlated to information discussed during the phone calls.

44.     On April 19, 2010, investigators also intercepted a telephone conversation between Pena and Encarnación. Pena called Encarnación and asked her how much she had given to Rodriguez. Encarnación replied "53," which I know from experience and training to mean $53,000. Pena said that he would give Rodriguez $21,500 and told Encarnación to "take note of this on your record. Add it up." Encarnación agreed to comply with the request.

45.     Similarly, on April 24, 2010, investigators intercepted a telephone call between Pena and Rodriguez. Pena called Rodriguez and told him to go to "the brick house," and pick up "36 pesos," which I know from my experience and training to mean $36,000. Pena gave Rodriguez Encarnación's telephone number and told him to call "Sally." He also instructed that she should "call Raulín so he can have it ready." Pena said that he did not have any "food," (heroin) and that all of his money was "on the streets." Rodriguez informed Pena that he had to pay his supplier but would "service [Pena] well." On April 29, 2010, investigators intercepted another telephone call involving Pena, in which Pena told Rodriguez to go to the "brick house" to collect payment for a drug debt.

46.     On June 2, 2010, pursuant to a federal search warrant, investigators searched 35 Wales Street. At that time, investigators seized, among other things, (1) a wallet; (2) a red notebook; (3) an Oxycodone pill bottle; (4) E-machines computer; (5) a computer tower; (6) $601 in United States currency found in one bedroom and $1,856 in United States currency found in a different bedroom (two of the defendant properties that comprise the Currency); (7) multiple identification cards; (8) multiple pieces of paper, containing phone numbers, and a phone bill; (9) T-Mobile sim cards and multiple compact disks; (10) multiple cell phones and mobile phone

boxes, (11) Calderon's passport, other identification documents, and correspondence; (2) three cellular telephones and a GPS device; (3) $3,315 in United States currency (one of the defendant properties); and (4) four packages of heroin containing approximately 50 grams each.

### C. Currency Seized from 130 Callender Street, Apartment 3, Dorchester, Massachusetts on June 2, 2010

47. During the course of the investigation, investigators became aware that 130 Callender Street, Dorchester, Massachusetts ("130 Callender Street"), a three-floor, three-unit residence with one unit on each floor, may be connected to the Pena drug trafficking organization. Ana Encarnación ("Ana"), who is believed to be Encarnación's sister, is listed as the resident of the first floor apartment. Encarnación's mother, Angelica Encarnación ("Angelica"), is listed as the resident of the third floor apartment at 130 Callender Street. Surveillance of Encarnación, her vehicles, and 130 Callender Street indicated that Encarnación and her infant daughter were also at least part-time residents of 130 Callender Street. Additionally, telephone conversations intercepted by investigators revealed that that Raulín was often at Ana's first floor apartment.

48. Investigators also observed Pena, Raulín, Calderon, and other associates entering and exiting 130 Callender Street in a pattern that indicated that they were using that particular residence to conduct drug trafficking business and, in particular, to potentially store drugs and drug proceeds. Moreover, from May 22, 2010 to March 17, 2010, investigators intercepted at least four calls involving Pena, Pena's associates, and Pena's customers referencing this building and Ana and Angelica, which gave investigators probable cause to believe that this Apartment, in addition to Ana and Angelica, may be involved in drug trafficking.

49. On May 11, 2010, one such call was intercepted. During this conversation, Pena told an associate that he had kept "five cars where Angelica lives" and that "they were never able to search him." Based on my training and experience, I believe that this meant that Pena was

telling the associate that he had stored five kilograms of heroin ("five cars") at Angelica Encarnación's home to avoid police detection.

50. On May 15, 2010, another call was intercepted, and during this call, Pena told Encarnación to call Angelica and requested that she pay Rodriguez 3,000 pesos. Encarnación also asked Pena if Rodriguez was going to pick up the money himself so that she could tell her mother who she would be giving the money to.

51. On May 16, 2010, investigators heard Pena ask Calderon how much money he had collected, and Calderon responded that he had collected $16,360. Pena asked if Calderon had "already got his $1,000," which Calderon responded yes. Pena then instructed Calderon to take "12 to his friend" and the rest to "Angelica." Calderon asked if "Angelica" was "Sally's mother," and Pena replied affirmatively. Thereafter, Pena gave Calderon Angelica Encarnación's telephone number.

52. On May 17, 2010, investigators also heard a conversation between Pena and one of his customers who owed him money for a drug debt. The customer told Pena that he would call Raulín in the morning to "take it to him." Pena responded, "No, the money is sent now to where I used to live, at Angelica." The customer asked if it was "at the street where I was going to drop the money before," and Pena replied, "to my wife's mother."

53. At approximately 6:05 a.m. on June 2, 2010, pursuant to a federal search warrant, investigators searched 130 Callender Street, Apartment 3, the apartment where Angelica was thought to reside. At the time the investigators executed the warrant, Encarnación, her infant daughter, Angelica, two other adults, and one other minor child were in the apartment.

54. Pursuant to the search, investigators seized, among other things, (1) multiple cell phones; (2) identification cards and documents; (3) visa and master cards; (4) three money orders

totaling $1230 (*i.e.*, three of the properties comprising the Currency), white envelope, manila envelopes, and a clear plastic bag with a combined amount of $13,286.40 in United States currency (*i.e.*, four of the properties comprising the Currency); (5) Toshiba laptop; and (6) handwritten document with names and telephone numbers.

55. Investigators seized $28,000 in United States currency (*i.e.*, one of the properties comprising the Currency) from the crib in Encarnación's bedroom. The $28,000 was made up of 72 $100 bills, 45 $50 bills, 939 $20 bills, 28 $10 bills, and 18 $5 bills. Investigators also found $1,014.40 in the crib in Encarnación's bedroom. Based on my training and experience, I know that drug transactions are cash transactions, and that the $20 denomination is a common denomination used in drug transactions.

56. At the time of the search, FBI Special Agents Ryan P. O'Neil ("SA O'Neil") and Thomas MacDonald ("SA MacDonald") advised Encarnación that she was under arrest pursuant to a federal arrest warrant and advised her of her rights via an "Advice of Rights" form, which she read and signed. Encarnación agreed to speak to SAs O'Neil and MacDonald without an attorney present.

57. Encarnación told SAs O'Neil and MacDonald that she lived in Apartment 3 of 130 Callender Street with her mother, Angelica, and several other family members. She stated that the large amounts of money found in her bedroom belonged to her husband of nine years, Pena, who was at that time in Pennsylvania. Encarnación further stated that all of the money found in the apartment belonged to Pena. Pena was later arrested in Hazelton, Pennsylvania.

### D. Currency Seized from 6 Priesing Street, Apartment 3, Jamaica Plain, Massachusetts

58. During the course of the investigation, investigators had probable cause to believe that Calderon's residence was 6 Priesing Street, Apartment 3, Jamaica Plain, Massachusetts

16

("6 Priesing Street"). This was based on research, which showed that Calderon listed the residence on his Massachusetts driver's license and through surveillance of Calderon and the vehicles that he was using.

59.     At approximately 6:20 a.m. on June 2, 2010, pursuant to a federal search warrant, investigators searched 6 Priesing Street. At that time, investigators seized from Calderon's bedroom, among other things, (1) Calderon's passport, other identification documents, and correspondence; (2) three cellular telephones and a GPS device; (3) $3,315 in United States currency (*i.e.*, one of the properties comprising the Currency); and (4) four packages of heroin containing approximately 50 grams each.

60.     During an interview with Calderon on May 20, 2011 with law enforcement, Calderon stated that Pena approached him and asked him to quit his job as a valet attendant and to come and work for him. Although Calderon rejected Pena's initial offer, he met with Pena a second time, in which Pena told him that he would pay him $1,000 per week, with a possibility of making $2,000 per week after Calderon learned the drug business. Pena gave Calderon $300 during this meeting, and he became Pena's delivery person. Thereafter, Pena taught Calderon the route to make the deliveries to the customers and also introduced Calderon to his clients.

  E.  **The Arrests of Pena and Hernandez on June 2, 2010**

61.     On June 2, 2010, Hernandez was arrested at his residence, 34 Avondale Street, Dorchester, Massachusetts ("34 Avondale Street"), pursuant to a federal arrest warrant for conspiracy to distribute heroin and for the distribution of heroin. At the time the arrest warrant was executed, Rebecca Gonzales ("Gonzales") was in the residence.

62.     Upon execution of the arrest warrant, investigators observed a black scale on the top of a dresser in the rear bedroom. Based on my experience, these types of scales are generally

used to assist with the preparation and weighing of narcotics prior to distribution. Through a translator, investigators were able to ask Gonzales questions related to the ownership of the apartment. The investigators discovered that Gonzales was the leaseholder of the apartment. After being advised of her rights and reading and signing the BPD Search of Property Consent Form, which was also translated into Spanish, Gonzales consented to a search of the apartment.

63.     BPD officers then requested a K9 unit with narcotic capabilities. Officer Miller and his K9 responded and swept through the apartment, and the dog indicated the presence of narcotics in the area of a shrine/closet in the kitchen area. After further inspection, a plastic bag of beige powder believed to be herion was recovered from a wooden mail holder on the wall. The investigators continued a sweep of the entire apartment based on Ms. Gonzales's consent.

64.     In addition to the bag of powder and the black scale, the investigators also seized, among other things, the following items: (1) numerous cellular telephones; (2) ledgers containing names, amounts of money, and numbers; (3) laptops; and (4) identification cards. In the basement, officers found a firearm wrapped in green shrink wrap and later determined to be a .25 caliber semi-automatic firearm with an unloaded magazine clip. A roll of green shrink wrap was also found in the kitchen area of the apartment.

65.     At the time that Hernandez was arrested, Luis Collazo, an individual who claimed to be Hernandez, was also charged with unlawful possession of a firearm, providing a false name at booking, and possession of an altered registry document.

66.     At the time of his arrest, Hernandez was in the United States illegally, was using a false identity, and had no known legitimate income. When investigators searched Hernandez incident to his arrest, they found $543 on his person (*i.e.*, one of the properties comprising the Currency).

67.     On the same day, Pena was arrested at 720 West Second Street, Hazelton, Pennsylvania, Pena had no known legitimate income and derived his income from his drug trafficking operation. When investigators searched Pena incident to his arrest, $20 in United States currency was found in his wallet (*i.e.*, one of the properties comprising the Currency).

### Conclusion

68.     Based upon the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the pains and penalties of perjury this 7th day of January 2014.

*[signature]* SA/FBI

Stephen J. Kelleher, Special Agent
Federal Bureau of Investigation